45 F.3d 443
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 SRI INTERNATIONAL, INC., Plaintiff-Appellee,
v.
ADVANCED TECHNOLOGY LABORATORIES, INC., Defendant-Appellant.
 No. 93-1074.
 United States Court of Appeals, Federal Circuit.
 Dec. 21, 1994.
Rehearing Denied Feb. 10, 1995.
 
 Before: NIES*, NEWMAN, and PLAGER, Circuit Judges.
 NIES, Circuit Judge.
 
 
 1
 By its Order entered on November 3, 1992, (Civil Action No. 91-CV-2191), the United States District Court for the Northern District of California granted SRI International, Inc.'s ("SRI") motion for partial summary judgment, concluding that: (1) United States Reexamination Certificate No. B1-4,016,750 ("the '750 patent") was not procured by inequitable conduct, (2) asserted claims 1, 9, and 20 were infringed and not invalid, and (3) Advanced Technology Laboratories, Inc. ("ATL") did not have a license and was not promised a license. ATL appealed the Order on the grounds that the court improperly granted summary judgment due to the presence of genuine issues of material fact.
 
 
 2
 For the reasons set forth below, we affirm.
 
 I. Jurisdiction
 
 3
 SRI contends that this court does not have jurisdiction to hear this appeal on the grounds that the appeal is not from an order "final except for an accounting", as required by 28 U.S.C. Sec. 1292(c)(2) (1992).[1] The crux of SRI's argument is that because the district court did not consider whether ATL's infringement was willful, opting instead to defer that determination until the damages phase, we do not have jurisdiction. We disagree.
 
 
 4
 In McCullough v. Kammerer Corporation, 331 U.S. 96 (1947), the Court, considering the appealability of a district court order under Sec. 1292(c)(2)'s predecessor, 28 U.S.C. Sec. 277a,[2] stated that
 
 
 5
 the object of [Sec. 227a] was to make sure that parties could take appeals in patent equity infringement suits without being compelled to await a final accounting. The reports of Congressional committees on the measure called attention to the large expenses frequently involved in such accountings and the losses incurred where recoveries where ultimately denied by reversal of decrees on the merits.
 
 
 6
 331 U.S. at 98.
 
 
 7
 The purpose and rationale of Sec. 1292(c)(2)--to permit a district court to stay a damages trial pending the outcome of an appeal on the merits--has been clearly stated by both Congress and the Supreme Court. This court has heard those clear statements. See In re Calmar, Inc., 854 F.2d 461, 463-64, 7 USPQ2d 1713, 1714 (Fed.Cir.1988) (Markey, C.J.) ("[T]he policy underlying Sec. 1292(c)(2) was to allow a district court to stay a damages trial pending appeal."); and Majorette Toys (U.S.) Inc. v. Darda, Inc., 798 F.2d 1390, 1391-92, 230 USPQ 541, 542 (Fed.Cir.1986) (an appeal can come to this court under Sec. 1292(c)(2) after validity and infringement are determined but prior to determining damages--the rationale underlying Sec. 1292(c)(2) is to allow appeals on the merits before computing exact amounts owed).[3]
 
 
 8
 The district court's failure to make a willfulness determination does not render its judgment respecting liability non-appealable. Willfulness is a finding related only to the amount of damages, not to the existence of liability. Liability for infringement is governed by 35 U.S.C. Sec. 271, which states that "whoever without authority makes, uses or sells any patented invention ... infringes the patent." Thus, an innocent infringer is no less liable for patent infringement than a willful infringer.
 
 
 9
 The culpability of the infringer comes into play, if at all, in determining the amount of damages owed the patentee. Indeed, a finding of willfulness does not require a court to increase damages. Read Corp. v. Portec, Inc. 970 F.2d 816, 826, 23 USPQ2d 1426, 1435 (Fed.Cir.1992) ("[A] finding of willful infringement does not mandate damages be enhanced, much less mandate treble damages."). The word "willful," or variations thereof, does not even appear in Title 35. Rather, Sec. 284 states only that "the court may increase the damages up to three times the amount found or assessed." Thus, enhancement of damages is discretionary. King Instrument Corp. v. Otari Corp., 767 F.2d 853, 866, 226 USPQ 402, 411 (Fed.Cir.1985), cert. denied, 475 U.S. 106 (1986). Accordingly, the absence of a willfulness determination does not preclude appeal under Sec. 1292(c)(2).
 
 II. Standard of Review
 
 10
 It is well-settled that a district court's decision to grant summary judgment is reviewed de novo. Parents of Student W v. Puyallup School District No. 3, 31 F.3d 1489, 1494 (9th Cir.1994); Meyers v. Asics Corp., 974 F.2d 1304, 1306, 24 USPQ2d 1036, 1037 (Fed.Cir.1992). According to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to a judgment as a matter of law. Although a detailed analysis by the district court would be helpful, we find no abuse of discretion in the trial court's making only a summary ruling in this case. The issues raised below are readily discernable from the motion papers and have been refined in the appellate briefs. Thus, we proceed with our review. See Devices For Medicine Inc. v. Boehl, 822 F.2d 1062, 1067-68, 3 USPQ2d 1288, 1293 (Fed.Cir.1987); Cable Electric Products, Inc. v. Genmark, Inc., 770 F.2d 1015, 1020, 226 USPQ 881, 883 (Fed.Cir.1985); and Petersen Manufacturing Co. v. Central Purchasing, Inc., 740 F.2d 1541, 1546, 222 USPQ 562, 566 (Fed.Cir.1984).
 
 III. Invalidity
 The Minton Reference
 
 11
 ATL contends that the claims in issue (i.e. claims 1, 9, and 20)[4] are either anticipated or rendered obvious by United States Patent No. 2,590,822 to Minton. Indeed, ATL asks for judgment in its favor if we do not discern a genuine issue of material fact.
 
 
 12
 The principal issue respecting the Minton patent is whether the reference is analogous art. That is, the teachings of Minton must not be "too remote to be treated as prior art." In re Sovish, 769 F.2d 738, 741, 226 USPQ 771, 773 (Fed.Cir.1985). In making an analogous art determination, the first question to ask focuses on whether or not a reference is from the same field of endeavor. If the reference is not from the same field of endeavor, a second question is asked: whether the reference is reasonably pertinent to the particular problem with which the inventor is involved. Clay, 966 F.2d at 659, 23 USPQ2d at 1060 (Fed.Cir.1992) (citing In re Deminski, 796 F.2d 436, 442, 230 USPQ 313, 315 (Fed.Cir.1986), and Application of Wood, 599 F.2d 1032, 1036, 202 USPQ 171, 174 (CCPA 1979)).
 
 
 13
 The claims in issue are directed to the ultrasonic imaging of the interior of body parts, such as for the purposes of medical diagnosis. Seismic prospecting, Minton's field of endeavor, is not the same. ATL argues that acoustic engineers in all fields attend the same symposia and publish in the same journals. It makes much of a book edited in 1975 by Green (the inventor of the '750 patent) to show that the "problem" addressed by Minton was the same. The Green book discusses acoustic visualization applications in connection with, inter alia, medical diagnosis and seismic mapping. However, the "problem" cannot be so generalized. The problem Green solved was how to compensate for changes in the spectral distribution of the return ultrasonic signal, with time or depth of penetration into a living organ, for enhanced image resolution and/or signal to noise ratio. The Minton reference, which relates to seismic prospecting circa 1946, almost thirty years prior to Green's filing date, would not have logically commended itself to Green's attention in considering how to compensate for changes in the spectral distribution of a received ultrasonic signal in an object such as a body part. There is no genuine issue of material fact as to whether or not Minton is analogous art.[5] We need not consider ATL's argument respecting Minton combined with other art.
 
 
 14
 ATL argues that even if Minton is non-analogous art, Minton can be an anticipatory reference and that claims 9 and 20 are anticipated. We disagree. Minton fails to teach "insonifying at least a portion of the body part with a beam of broadband acoustic energy to produce echo signals from within the body", the first recited step in claims 9 and 20. Instead, Minton discloses detonating an explosive charge to create seismic waves. Therefore, Minton is simply incapable of invalidating claims 9 and 20 for lack of novelty.
 
 The Weighart Reference
 
 15
 ATL advances the argument that claims 1 and 9 (but not 20) of the '750 patent are invalid under Sec. 103 in view of Weighart, U.S. Patent No. 3,309,914. Weighart is directed to ultrasonic inspection of objects, such as turbine rotors, for flaws or defects using multiple frequencies simultaneously.
 
 
 16
 As an initial matter, we note that the entire focus of the reexamination of the '750 patent was the Weighart reference. It was the only patent considered by the Patent Office during reexamination. By issuing the reexamination certificate, the Patent Office concluded that the asserted claims would not have been obvious in view of Weighart. Accordingly, "[d]eference is due the Patent Office decision to issue the patent with respect to evidence bearing on validity which it considered." American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed.Cir.), cert. denied, 469 U.S. 821 (1984). See also Polaroid Corp. v. Eastman Kodak Co., 789 F.2d 1556, 1560, 229 USPQ 561, 564 (Fed.Cir.), cert. denied, 479 U.S. 850 (1986) (when a party attacking validity relies only on prior art that was before the PTO examiner during prosecution, that party has added burden of overcoming the deference due a qualified governmental agency).
 
 
 17
 ATL argues that the affidavit and testimony of its expert, Dr. Fox, creates an issue of fact respecting the issue of obviousness of the claims in view of Weighart. Dr. Fox conducted several computer simulations which allegedly demonstrated that Weighart "can be designed to provide a unitary continuously variable filter." While Weighart disclosed a three-section filter which did not so operate, Fox's conclusion about how it could be designed to operate was based on the following sentence in the Weighart specification at column 3, lines 67-70: "the control signals from the amplifier gain compensation may be either in the shape of rectangular 'off-on' gates or complex curves to provide optimum band-pass characteristics."
 
 
 18
 In the letter transmitting the simulations to ATL's counsel, Fox indicated that he utilized a state-of-the-art computer executing a software package titled "Mathematica". According to Dr. Fox, this combination of hardware and software "[i]n essence [enabled] a more detailed analysis of the implications of Weighart's concept than was readily possible at the time of his patent [i.e. 1967]."
 
 
 19
 Unquestionably, this type of advanced hardware and software were not available to Green in 1975. It therefore follows that it was highly unlikely, if not outright impossible, for Green to be able to extrapolate from Weighart what Fox did (some 25 years after Weighart issued) to support his conclusion that Green's claims would have been obvious. Moreover, Dr. Fox admitted that he set out "to prove that Weighart could be operated to effectively duplicate the operation of Green."
 
 
 20
 ATL thus has attempted exactly what this court deemed impermissible in Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1051, 5 USPQ2d 1434, 1438 (Fed.Cir.), cert. denied, 488 U.S. 825 (1988) (the district court "impermissibly used hindsight to reconstruct the claimed invention from prior art with the [patented] invention before it and aided by [the accused infringer's] expert, rather than viewing the invention from the position of a person of ordinary skill at the time it was made"). Accordingly, we conclude that the parties' dispute regarding the content of the prior art does not present a genuine issue of material fact which would preclude summary judgment.
 
 
 21
 The ultimate conclusion of obviousness is a question of law. Gardner v. TEC Systems, Inc., 725 F.2d 1338, 1344, 220 USPQ 777, 782 (Fed.Cir.), cert. denied, 469 U.S. 830 (1984). An expert's opinion on the ultimate legal conclusion of obviousness is not "factual" evidence. Although the parties' experts disagree on the conclusion of obviousness, "conflicting opinions on a legal issue vel non raise no issue of fact. Petersen, 740 F.2d at 1548, 222 USPQ at 567. Thus, the conflicting opinions of ATL's and SRI's experts on the ultimate conclusion of obviousness are no obstacle to the grant of summary judgment.
 
 IV. Infringement
 
 22
 The district court concluded that ATL's devices literally infringed claims 1, 9, and 20 of the '750 patent. The parties' dispute regarding infringement of claims 1 and 9[6] centers on a claim phrase consisting of two unambiguous words: "continuously variable." In this case, claim interpretation is a question of law. Smithkline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988).
 
 
 23
 In support of its argument of noninfringement, ATL states that "[t]he plain language of claims 1 and 9 requires time varying the unitary passband of a filter 'continuously ... while receiving' an echo signal." (emphasis added) ATL interprets the "continuously ... while receiving" language as requiring a passband that is "continuously varied" while the echo signal is received.
 
 
 24
 According to ATL's expert, the ATL devices do not infringe claims 1 and 9 because "[t]he frequency response of the filters contained in those products include an initial flat portion followed by a variable portion followed by a second flat portion." Since the passband in ATL's devices are continuously variable only over a portion of the receive cycle, ATL argues that their passband is not continuously varied and, therefore, they do not infringe. We disagree.
 
 
 25
 We note that the passage cited by ATL includes an ellipsis which, in the case of exemplary claim 9, spans two claim steps and takes the place of twenty-three (23) other words. The two claim steps are repeated here in their entirety, with the words omitted by ATL emphasized:
 
 
 26
 passing the electrical signals through bandpass filter means having a unitary, continuously variable, passband, and time varying the unitary passband of the bandpass filter in relationship with the depth from which echo signals are received while receiving echo signals from over a range of depths within the body for compensating for depth dependent changes in the spectral distribution of echo signals.
 
 
 27
 Upon reading the complete text of both claim steps from which ATL plucked a mere three words, the word "continuously" clearly modifies only the word "variable". The word "continuously" thus does not, as ATL would have it, modify "time varying". The plain language of the claim requires only that the passband be time varied at some point while the echo signal is received; not that the passband is continuously varied for the entire period during which echo signals are received.
 
 
 28
 The fact that ATL opted to program its device so that the passband is flat-variable-flat while receiving echo signals does not avoid the claim language. Since ATL's passband is continuously variable while echo signals are received (albeit not continuously varied), we agree with the district court that ATL's devices literally infringe claims 1 and 9.
 
 V. Inequitable Conduct
 
 29
 ATL alleges that during reexamination SRI misrepresented to the PTO by a diagram how the Weighart device operated. Although ATL argues that SRI's representation was "grossly negligent", ATL's witness, Dr. Fox, actually testified that the representation to the PTO was "grossly inaccurate" in view of his modelling studies.
 
 
 30
 We have reviewed the record and find no evidence of conduct on the part of SRI which raises a genuine issue respecting SRI's intent to deceive the PTO or of the materiality of the diagram to the Examiner's allowance. The worst that could be said is that SRI misunderstood the reference--if it did. The sole piece of art before the Examiner was the Weighart reference. The diagram was in no sense "evidence" but merely argument which the Examiner was free to reject as with any other argument, and to reach his own conclusion. See Akzo N.V. v. United States International Trade Commission, 808 F.2d 1471, 1482, 1 USPQ2d 1241, 1247 (Fed.Cir.1986), cert. denied, 482 U.S. 909 (1987). Accordingly, we conclude that no genuine issues of material fact exist as to inequitable conduct, and summary judgment was properly granted in favor of SRI.
 
 VI. License/Implied License
 
 31
 ATL's final argument is that they were licensed, or were promised a license, under the '750 patent based on a 1980 license agreement between the parties. ATL contends that because of a provision titled "KNOW-HOW", the license agreement covered the '750 patent.
 
 
 32
 In order to properly address the parties arguments, we must now turn to the applicable state law--California. Under California law, extrinsic evidence may be properly admitted to construe a written instrument when its language is ambiguous. Winet v. Price, 4 Cal.App.4th 1159, 1165 (Cal.Ct.App.1992). We agree with ATL that the provisions of the agreement in question are clear and unambiguous. Extrinsic evidence is therefore inadmissible. Eastern-Columbia v. System Auto Parks, 224 P.2d 37, 40, 100 Cal.App.2d 541, 545 (Cal.Dist.Ct.App.1950) ("If the language of the instrument is clear and explicit the intention of the parties must be ascertained from the writing alone."). In California, when no parol evidence is introduced, as is the case here, interpretation of the writing is a question of law. As such, this court can independently construe the license agreement. Winet, 4 Cal.App.4th at 1166.
 
 
 33
 "The cardinal requirement in the construction of ... contracts is that the intention of the parties as gathered from the four corners of the instrument must govern." City of Manhattan Beach v. Superior Court, 25 Cal.App.4th 1647, 1653 (Cal.Ct.App.1994). According to the four corners of the agreement, the actual grant from SRI to ATL was "a worldwide nonexclusive right and license under PATENT RIGHTS to make, have made, use and sell LICENSED PRODUCTS" and a "nonexclusive right to use KNOW-HOW to make, have made, use and sell LICENSED PRODUCTS." PATENT RIGHTS were explicitly defined in paragraph 2.4 as "the patent applications listed in Appendix A" as well as continuing applications and foreign counterparts thereof and any patents issuing thereon. KNOW-HOW was explicitly defined in paragraph 2.6 as "technical information" relating to a certain type of medical imaging instruments. LICENSED PRODUCTS were explicitly defined in paragraph 2.1 as a certain type of medical ultrasonic imaging instruments "covered by PATENT RIGHTS and/or utilizing KNOW-HOW".
 
 
 34
 ATL urges us to broaden the definition of KNOW-HOW to encompass the '750 patent, which had already been issued at the time the agreement was executed. The clear intention of the parties, as evidenced by the express language of the agreement, prohibits such an expansive interpretation of that provision.
 
 
 35
 We find no language in the agreement supporting ATL's position. Indeed, we can find no language that even suggests the agreement should be construed to cover any already issued patent. All indications suggest that the license was intended to encompass only certain patent applications, not already issued patents. For example, the granting clause refers to patent rights, which were expressly defined only as the patent applications in Appendix A.[7] Furthermore, paragraph 1.3 of the agreement clearly states that "ATL wishes to acquire a license under SRI's technology and patent applications." Additionally, the parties' inclusion of a provision tilted "FUTURE PATENTS", and SRI's grant of an option to ATL to include these future patents within the scope of the license, indicates that the parties had considered the distinction between pending patent applications and patents, and argues against adopting ATL's position.
 
 
 36
 We, therefore, agree with the district court that the 1980 license agreement did not grant ATL an express license to practice the invention claimed in the '750 patent. ATL's arguments regarding license by estoppel have been considered, but are unpersuasive.
 
 VII. Conclusion
 
 37
 We therefore conclude that the district court did not improperly grant SRI's motion for partial summary judgment that the '750 patent was infringed and not invalid, was not procured by inequitable conduct, and that ATL was not licensed under the 1980 license agreement. Accordingly, the district court's judgment is affirmed.
 
 
 
 *
 Circuit Judge Helen W. Nies vacated the position of Chief Judge on March 17, 1994
 
 
 [1]
 Section 1292(c)(2) provides, inter alia, that this court shall have exclusive jurisdiction "of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to [this court] and is final except for an accounting."
 
 
 [2]
 Act of February 28, 1927, Pub.L. No. 69-662, 44 Stat. 1261. Section 227a provided that "when in any suit in equity for the infringement of letters patent for inventions, a decree rendered which is final except for the ordering of an accounting, an appeal may be taken from such decree to the circuit court of appeals...."
 
 
 [3]
 As noted in our earlier order of November 25, 1992, this court has also, without discussion, entertained appeals of bifurcated cases where the accounting phase included a determination of willfulness. Bott v. Four Star Corp., 807 F.2d 1567, 1 USPQ2d 1210 (Fed.Cir.1986); and Central Soya Co., Inc. v. Geo. A. Hormel & Co., 723 F.2d 1573, 220 USPQ 490 (Fed.Cir.1983)
 
 
 [4]
 1. In an ultrasonic system for the examination of the interior of objects, such as body parts, the combination comprising,
 means for insonification of an object under examination with a broadband ultrasonic wave signal,
 means for receiving echo signals from discontinuities over a range of depths within the insonified object and for converting the same to electrical signals,
 means for filtering said electrical signals by bandpass filter means having a filter transmission factor as a function of frequency which is variable, and
 means for compensating for depth dependent changes in the spectral distribution of the echo signals by time varying the filter transmission factor versus frequency characteristic of the bandpass filter means in accordance with the depth of the discontinuity from which the echo signal is reflected.
 
 
 [9]
 In a method for the non-invasive examination of objects such as body parts, the steps of
 insonifying at least a portion of the body part with a beam of broadband acoustic energy to produce echo signals from within the body,
 receiving echo signals from within the body and converting the same to electrical signals,
 passing the electrical signals through bandpass filter means having a unitary, continuously variable, passband, and
 time varying the unitary passband of the bandpass filter in relationship with the depth from which echo signals are received while receiving echo signals from over a range of depths within the body for compensating for depth dependent changes in the spectral distribution of echo signals.
 Claim 20 recites:
 
 
 [20]
 In a method for the non-invasive examination of objects such as body parts, the steps of
 insonifying at least a portion of the body part with a beam of broadband acoustic energy to produce echo signals from within the body,
 receiving echo signals from within the body and converting the same to electrical signals,
 passing the electrical signals through bandpass filter means having a variable filter transmission factor versus frequency characteristic, and
 time varying the filter transmission factor versus frequency characteristic of the bandpass filter in relationship with the depth from which the echo signals are received while receiving echo signals from over a range of depths within the body for compensating for depth dependent changes in the spectral distribution of echo signals, the filter transmission factor versus frequency characteristic of the bandpass filter which is time varied comprising the filter passband which is reduced as the depth from which the echo signals are received is increased.
 
 
 [5]
 In December of 1992, a third party (Acoustic Imaging Technologies) requested the second reexamination of the '750 patent based on, inter alia, the Minton reference. Upon completion of the reexamination proceedings, the examiner noted in his July 8, 1993, report that a patent from the field of seismic prospecting would not be relevant to an inventor concerned with the attenuation of ultrasonic waves within living organisms
 
 
 [6]
 During oral argument, and by lack of argument in their briefs, ATL conceded infringement of claim 20
 
 
 [7]
 The parties do not dispute that the '750 patent was not listed in Appendix A