EWP CORPORATION, and La Societe Trefilunion, Plaintiffs-Appellees,

v.

RELIANCE UNIVERSAL INC., and Exposaic Industries, Inc., Defendants-Appellants.

Appeal No. 84–711.

United States Court of Appeals, Federal Circuit.

Feb. 21, 1985.

---

Davis, Circuit Judge, concurred with opinion.

John D. Nies, LeBlanc, Nolan, Shur & Nies, Arlington, Va., for defendants-appellants.

Nathaniel R. French, Biebel, French & Nauman, Dayton, Ohio, argued for plaintiffs-appellees.

Before RICH, DAVIS and BALDWIN, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the judgment of the United States District Court for the Southern District of Ohio entered after a bench trial, holding the single method claim of U.S. Patent No. 3,578,036 (Francois or '036 patent) valid and Exposaic Industries, Inc. (Exposaic), liable for both contributory infringement and inducement to infringe under 35 U.S.C. § 271(c) and (b), respectively. 221 USPQ 542. Direct infringement by Reliance Universal Inc. (Reliance) under § 271(a) was admitted. We reverse.

## Background

EWP Corporation is an Ohio corporation and a wholly-owned subsidiary of Price Brothers Company, a major manufacturer of reinforced concrete pipe, machinery for making pipe, and wire mesh used as reinforcing material in concrete pipe. La Societe Trefilunion, assignee of the Francois patent in suit, is a French corporation, operating in France, and is also a manufacturer of wire reinforcing mesh.

Appellant Exposaic is a North Carolina corporation that manufactures welded wire mesh intended for use as reinforcing material for concrete products, including concrete pipe, but it does not itself manufacture concrete pipe. Appellant Reliance is an Ohio corporation that manufactures concrete pipe and purchases wire mesh reinforcing material from Exposaic.

EWP is the exclusive licensee of Trefilunion with the right to grant sublicenses and to bring suit in its own name against any infringer of the '036 patent, which is entitled "Lattice for the Reinforcement of Tubular Concrete Elements Having a Socket[,] Method for Producing Said Lattice and the Products Obtained." It discloses a method for producing wire mesh reinforced concrete pipes having a socket or bell that forms a flared end suitable for mating with the straight end of an adjacent pipe and the product produced thereby but claims only the method of producing the wire reinforcement.

The single claim of the patent reads:

A method for producing a reinforcement having a socket for a reinforced concrete tubular element having a socket, from a lattice having warp wires and weft wires and wherein a number of the warp wires have successive deformed non-rectilinear portions, the deformations of said portions being permanent and such that, upon exertion of tensile stress thereon, said portions can be at least partially straightened, whereas the other warp wires and all the weft wires are rectilinear, said method comprising, in a first stage, forming a prereinforcement by bending and closing onto themselves, in the form of welded rings, the transverse wires of a section of said lattice, said section being such that the transverse wires corresponding to the socket, and only these wires, have a succession of permanently deformed nonrectilinear portions so that they have an apparent perimeter equal to the perimeter of the nondeformed transverse wires of the rest of the prereinforcement but a real length substantially greater than said perimeter, then, in a second stage, radially expanding the prereinforcement so as to elongate at least partially said nonrectilinear portions of the transverse wires of its socket and impart thereto an apparent perimeter which is substantially greater than that of the rest of the prereinforcement and corresponds to that of the desired socket of the reinforcement.

Figures 1, 2, and 3 of the '036 patent are reproduced below:

FIG.1 FIG.2 FIG.3

As shown, the flat lattice or mesh A of Fig. 1 has warp wires 1 and 2 and weft wires 3 intersecting at right angles and being welded together at their intersections. This lattice is bent and welded into a cylindrical form, or prereinforcement, shown as B in Fig. 2. Transverse circular rings 1a and 2a are formed from the warp wires 1 and 2 of the mesh. Warp wires 2a have convolutions, corrugations, or other nonrectilinear portions such that these rings can be expanded in diameter, by use of appropriate apparatus, and undergo an increase in circumference as shown in Fig. 3. The claimed method is thus a procedure for producing such a reinforcement cage. Fig. 3 also shows in section a portion of concrete pipe T poured and molded around the cage, thereby forming a pipe with a tubular body having a mean diameter $d$, extending from $a$ to $b$, and a socket portion $e$.

The preamble section of the patent specification states that reinforcing concrete pipe with welded wire lattices was known but that, with respect to reinforcing the socket portion, since the "best steels do not have sufficient elongation characteristics to permit a large expansion without fracture," two situations existed. First, reinforce-

ment of the socket portion had been avoided or, second, reinforcements had been made in two parts, one for the pipe body and a wider part for the socket, the two parts being connected by wires. The patentee's invention is then described, in summary fashion, by the following language which closely resembles that of the claim:

The object of the present invention is to overcome these drawbacks.

The invention provides a lattice of welded metal wires wherein a number of the warp wires have successive deformed nonrectilinear portions, the deformations of said portions being permanent and such that, upon exertion of tensile stress thereon, said portions can be at least partially straightened whereas the other warp wires and all the weft wires are rectilinear.

Owing to their deformed portions, which may form folds, waves, fractions of a coil or any other sinuosities or convolutions, it is possible to elongate the corresponding warp wires and the lattice can undergo, in the portion pertaining to these wires, an expansion in the direction in which the warp wires extend.

After expanding extensively on this broad statement of the invention, the specification then explains the conversion of the lattice into the finished reinforcement for a section of concrete pipe as follows:

Now, let is [sic] be assumed that it is required to construct a reinforcement for a concrete tubular element T having a socket *e* (Fig. 3). There is cut from the lattice according to the invention a section A (Fig. 1) whose dimensions correspond to the [sic] those of the reinforcement to be embodied in this pipe or tubular element T. This section can be cut at the site of construction of the pipes from a roll of lattice or in a factory and delivered to the site in the flat condition.

* * * * * *

The section A of lattice is bent and welded in the form of cylindrical blank or prereinforcement (B) (Fig. 2). * * *

* * * * * *

In order to change from the cylindrical prereinforcement B shown in Fig 2 to the final reinforcement C shown in Fig. 3, the prereinforcement B is mounted on a [sic] expanding machine for expanding the rings 2ᵃ. *This expansion is achieved by means of a known apparatus,* such as an expansible mandrel controlled by hydraulic pneumatic or mechanical means and inserted in the rings 2ᵃ.

By means of it is [sic] apparatus, only the corrugated rings 2ᵃ are expanded and undergo both a mechanical circumferential elongation owing to the straightening of the corrugations or other deformations and an intrinsec [sic] elongation, that is an elongation in the fibers of the metal. [Emphasis ours.]

After this expansion step (the "second stage" of the method claim), the convoluted wire rings 2a of Fig. 2 become the similar but somewhat less convoluted wire rings 2b of Fig. 3 of enlarged diameter.

In the prosecution of the application for the patent in suit in the Patent and Trademark Office (PTO), the examiner cited only two prior art references, a Laswell patent and a Whitacre et al. patent, neither of which is relied on in this suit with respect to the validity of the claim in suit. The latter patent is on a machine for making welded, helical wire, pipe or post reinforcement cages capable of making cages of varying diameter. Laswell is even farther afield, being a wire structure used as spacer in composite, metal, vehicle floor panels not made of concrete. The patent does clearly disclose, however, the technique of first crimping a wire reinforcement and thereafter lengthening the wire by putting the crimped wire under tension to remove the crimp.

Having considered the careful review of the prior art by the district court and the briefs in this court, we set forth below what appears to us to be the prior art most relevant to the method claimed in the patent in suit.

German patent 694086 was issued (ausgegeben) 25 July 1940 and received in the U.S. PTO November 12, 1940. It relates to the making of hollow reinforced concrete bodies such as pipes, among other things, containing longitudinal iron reinforcing rods which are connected together by "transverse reinforcements." Figs. 1 and 2 of the patent are reproduced:

Abb. 1

Abb. 2

Fig. (Abb.) 1 shows reinforcing "cage wires," to use appellees' term, *a* being the longitudinal wires and *c* the "transverse reinforcement, consisting of corrugated spiral wire." In other words, the transverse member *c* is a "corrugated wire" wrapped spirally around the long wires *a*. In the process described in this patent, a hollow member such as a pipe is made of two layers in a mold. First, an outer layer is formed and the cage is placed inside it and then pressed outwardly—expanded—by a mandrel or "press core" into the first layer of wet concrete. The process is shown in Figs. 5 and 7, redrawings of which we take from appellees' brief:

Fig. 5 shows a lined mold *h –i*, a first layer of concrete *b* and the cage elements *a, c*. The cage is being pressed outwardly into the concrete *b* by a tapered mandrel *g*.

Fig. 7 shows the same after cage *a, c* has been expanded and a second layer of concrete $b_2$ laid over and pressed into it by the mandrel. The patent says *g* is a "press

core which is conically or cylindrically extensible." It also states, significantly for this case, "It is essential for the new invention to use *extensible transverse reinforcements* [c] which connect the long iron inserts [a]." (Our emphasis.) And again, "The process consists in that after formation of the outer concrete wall, the reinforcing rings * * * corrugated overall are expanded by internal pressure without springing back, upon which the internal concrete wall is formed."

The other most relevant prior art, in our view, is French patent 1,474,698 issued to the German firm, Sudweststahl G.m.b.H., entitled "Lattice Reinforcement for Reinforced Concrete Construction" and disclosing a wide variety of reinforcing elements or structures which may be prefabricated and "permitting modification of the distance between reinforcing bars within determined limits." Below are some of the more pertinent illustrations followed by related statements from the specification:

FIG.10

FIG.11

FIG. 17

FIG.14

FIG.15

FIG. 16

In the above figures, longitudinal reinforcing members are shown at 21′, 23′, 35, 44, 48, and transverse or linking wires having a variety of bends, undulations, or zigzags *to permit extension* at 31′, 34, 42, 43, and 46. The following general statements are from the specification:

According to the invention, two or more reinforcing elements, such as mutually parallel bars, are interconnected such that a lateral displacement of these bars with respect to each other is possible *to match the reinforcing element to the desired dimensions;* for transportation requirements, the individual elements can be compressed such that the bars touch each other.

The linking elements are flexible but nevertheless rigid enough. They are composed of wires or strips which can be welded to the reinforcement bars, crimped, tied, or fixed in some other appropriate manner, for example by means of a movable sleeve or by another like piece.

*The linking elements,* in the form of wire or of flat strips, maintain the bars at a controllable and determined mutual spacing, and *can likewise have one or more folds, i.e., can be folded in a zig-*

*zag form so as to be more or less stretched according to the desired distance between the reinforcing bars to be connected together.*

\* \* \* \* \* \*

*In place of zigzag linking elements provided with folds, it is possible to utilize spiral linking elements which, in their length, can be extended or compressed to a greater or lesser extent in order to keep the reinforcing bars at the predetermined desired distance.* [Emphasis ours.]

Although diametrical expansion of reinforcement rings is not expressly disclosed, the use of the reinforcements for pipe was not remote from the thinking of this patentee. The following appears:

To reinforce *pipes,* a reinforcing element according to the invention can likewise be used. In such an element, the closed rings, mutually parallel and embodied as reinforcing bars, are kept together by the linking elements such that the distance between the rings can be regulated to a determined value, preferably by twisting them. [Emphasis ours.]

Fig. 19, below, is a reinforcing element for pipes as described in the preceding paragraph. Having no crimped wires, it is not particularly relevant here, but is included for completeness.

FIG. 19

In discussing this reference, the trial judge, closely tracking the testimony of appellees' professorial patent expert witness, Dr. Starkey, instead of applying the more relevant teachings of this patent to the issue of obviousness, concentrated on Fig. 19 because it related to pipe. He then found "significant differences" between the Fran-

cois invention and the invention of French '698 saying the latter has "flexible 'linking elements'," whereas Francois has "no linking elements as such," although the crimped wires of Francois shown as 2, 2a, and 2b, supra, link the longitudinal, initially parallel wires 3 which, *in the words of French '698,* "can be ... more or less stretched according to the desired distance between the reinforcing bars." Compare Figs. 2 and 3 of the patent in suit, supra, where the lower ends of the bars 3 have been moved farther apart by stretching the crimped wires from the 2a to the 2b size. It is not Fig. 19 that is significant in this case, but the other clear teachings of the reference. The "expert" testimony misdirected the court's thinking.

## OPINION

### *The Obviousness Question*

██ Whether the single claim of the Francois patent in suit is valid under 35 U.S.C. § 103 is a question of law and that question is freely reviewable by this court. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966); *Gardner v. TEC Systems, Inc.,* 725 F.2d 1338, 1344, 220 USPQ 777, 782 (Fed.Cir.1984). The PTO examiner did not cite the German or French '698 patents against the '036 patent application. Therefore, in considering obviousness, we have no PTO view before us on obviousness in view of those references and appellants' burden of proof under 35 U.S.C. § 282 is more easily carried. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed.Cir.1984). It is our view that the claim is invalid because its subject matter would have been obvious to a person having ordinary skill in the wire reinforcement art at the time the invention was made.

The district judge made what appears to be a detailed and careful analysis of the prior art and, indeed, we agree with much of it, including his discarding of several prior art references on various grounds as lacking pertinence. The bases of our disa-

greement are few but fundamental and fairly simple. In explaining them we shall discuss only the most relevant prior art references and the teachings of the Francois patent itself. Speaking generally, the district court's opinion, in its discussion under the heading "II. Nonobviousness," takes what we deem to be an erroneous *approach* to the issue in comparing the Francois invention with the prior art. In the first place, the approach seems to regard the invention as tied to the making of concrete bell and spigot pipe and to appraise the pertinence of each reference individually on that basis. As we view the *method* of the single claim in suit, however, it is not a method of making concrete pipe, of bell and spigot type or otherwise, notwithstanding the reference in the claim to "reinforced concrete." The method pertains only to making a wire reinforcement of tubular or cylindrical form, an end portion of which can be enlarged in diameter, if desired, by stretching.

A major portion of the "prior art," under § 103 is actually recited in the Francois patent.* It is there explained that "It is already known to employ a lattice for reinforcing concrete tubular elements...." For what is meant by the term "lattice," see Fig. 1, supra. It is next stated that "the best steels do not have sufficient elongation characteristics to permit a large expansion without fracture." That is to say, the lattice, made into tubular form and welded, cannot be stretched *enough* to fit bell and spigot pipe without breaking some circular wires. That was the problem faced by Francois. His solution was to include in the part of the lattice he wished to enlarge "a number of warp wires [which] have successive deformed nonrectilinear portions." With them, the patent states, "it is possible to elongate the ... warp wires and the lattice can undergo, in the portion pertaining to these wires, an

expansion in the direction in which the warp wires extend." To produce the desired expansion, the cylindrical cage (Fig. 2) is "mounted on a [sic] expanding machine .... This expansion is achieved by means of a known apparatus such as an expansible mandrel...."

■ It would be going too far, as a matter of patent law, to agree with appellants' brief that the "solution to the problem of wire breakage would seem to be dictated by the most elementary common sense." But we can say the solution would have been obvious to the hypothetical person of ordinary skill postulated by 35 U.S.C. § 103 if we find evidence of prior art which shows he would have been presumed to know that the way to make a reinforcing wire expansible is to corrugate or crimp it. *See Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1449, 223 USPQ 603, 614 (Fed.Cir.1984). German patent 604,086 is such evidence and further evidence is provided in French patent '698. We can express full agreement with the following statement in the trial court's opinion:

> It cannot be denied that the Francois invention is strikingly simple. Yet, simple and obvious are not synonymous terms. It is perceived that the invention depends for its successful operation upon two simple principles: a steel wire of a given length can be deformed or bent into a smaller apparent length, and then later be stretched back closer to its original length; and further, if the deformed wire is bent into a circle before it is stretched, the stretching will result in a circle with a larger diameter. Of all the prior art references relied on by defendants, the German '086 patent clearly exhibits the greatest similarity to the Francois invention. As noted, the German patent discloses a wire lattice reinforcement for concrete whose circumferential

---

* Appellee's brief makes the same point in arguing that the *best* prior art was therefore before the PTO. But it must be considered, under § 103, in conjunction with art that was *not* before the PTO in deciding whether the claimed invention would or would not have been obvious—a legal

conclusion which is not based on the operation of Francois' brain but is the court's appraisal of what would have been obvious to one of ordinary skill in the art aware of the disclosures of *all* of the prior art.

wires are corrugated, and thus "extensible." The German patent, like the Francois patent, then discloses the use of a mandrel to exert radial force upon these circumferential wires for the purpose of stretching them and expanding their circumference. These aspects of the German patent and the Francois patent are thus, in principle, the same.

What the law requires us to disagree with is the trial court's disregard of the clear *teaching* of the German patent to corrugate or crimp wires which one wishes to expand or stretch because of "significant differences" it found "between the German *invention* and the Francois *invention*." (Our emphasis.) That was the erroneous approach of appellees' expert witness. The court said, "Unlike the Francois patent, the German patent discloses nothing with respect to the formation of a socket or bell. All of the circumferential wires are corrugated ... to the same extent." And so on. Such differences are irrelevant. A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect. On the issue of obviousness, the combined teachings of the prior art as a whole must be considered.

■ We cannot escape the conclusion that Francois did no more than apply the presumed knowledge of the art to provide an obvious solution to a simple problem: use crimped wire where there is a need in a subsequent forming step to expand or stretch it. That presumed knowledge was, of course, available to all. It is irrelevant whether or not Francois was aware of it. Patentability under the statute, § 103, is a decision made on the basis of a hypothesis: Would the invention have been obvious "to a person having ordinary skill in the art to which the subject matter pertains" in the light of all knowledge conveyed by "prior art" as defined by statute and case law. It is a decision which must be made by courts because the law assigns that task to them. The function of witnesses, expert and otherwise, is to assist the court in determining and comprehending facts.

The trial court properly undertook to decide upon the level of ordinary skill in the art, a point upon which neither party introduced evidence. In doing so, it clearly erred in assuming that the involved art is making reinforced concrete products. Considering the invention here claimed, we see it as a narrower field: the making of reinforcing wire cages and the like. We mention it only because the view that concrete technology is involved seems to have been the basis for finding several references not pertinent because they did not relate to concrete pipe or, even more specifically, bell and spigot pipe. This was a ground for effectively ignoring the relevant teaching of the German patent because the *concrete body* was different, made by a different process, and "there is no disclosure of a socket of increased diameter at one end." That is of no moment. Its significance is in its teaching that when a wire reinforcing cage is to be expanded, the wires undergoing stretching should be crimped or, in the words of the claim in suit, provided with "successive deformed non-rectilinear portions," which means the same thing.

In reaching our conclusion that the invention claimed would have been obvious, we have considered the evidence and arguments pertaining to the so-called "secondary considerations" such as commercial success, licensing, adoption by the industry, etc. Upon full consideration of all the evidence, we remain convinced that it presents a clear and very strong case of obviousness based on admissions and the teachings of the new references above considered.

■ When, as happened here, the PTO issues a patent because the examiner did not consider prior art teaching the very technique essential to the claimed invention—crimping of wire which is to be stretched later—it is not unusual to see astute businessmen capitalize on it by erecting a temporarily successful licensing program thereon. Such programs are not infallible guides to patentability. They sometimes succeed because they are mutually beneficial to the licensed group or be-

cause of business judgments that it is cheaper to take licenses than to defend infringement suits, or for other reasons unrelated to the unobviousness of the licensed subject matter. Such a "secondary consideration" must be carefully appraised as to its evidentiary value and we have tried to do that here.

Concluding that the patent is invalid under § 103, we deem it unnecessary to reach the other issues of infringement, inducing infringement, contributory infringement, damages, etc.

For the foregoing reasons, the decision below is *reversed.*

REVERSED.

DAVIS, Circuit Judge, concurring:

I join Judge Rich's opinion but write separately because of the need to explain more in detail why, to my mind, the "secondary considerations" do not in this case outbalance the "clear and very strong case of obviousness based on admissions and the teachings of the new references" (as the majority opinion properly puts it). The District Court found (a) "convincing evidence" that the invention involved here "filled a long felt and serious need in the reinforced concrete pipe industry"; (b) this invention had a strong impact on that industry (in this country) in that "virtually every manufacturer of wire mesh" for this kind of pipe not only sought and obtained a license but also abandoned prior art methods of bending and welding bells in reinforcement cages; and (c) there was sufficient motivation and effort toward discovering a new method but this was not accomplished for a considerable period of time.

Appellants correctly point out that these findings (particularly those as to the supplanting of prior methods) are overstated, but there can be no doubt that the invention of the '036 patent became very successful and has been much used. Nevertheless, I agree that this ample fulfillment of need does not prevail to show non-obviousness. First, as Judge Rich's opinion shows, the invention was very, very clearly foreshadowed by the pertinent teachings of the German and French patents. Second,

it seems to me not significant (though the trial court thought it very important) that the invention "wasn't developed sooner." The simple fact probably is that those teachings of the German and French patents were actually not well-known even in the pertinent art, but under the settled rule of § 103 that fact is irrelevant—they were still part-and-parcel of the prior art even if they were not in fact well-known in the United States; they are an integral part of the *"presumed"* knowledge. To me, this lag between "actual knowledge" and "presumed knowledge," not legal non-obviousness—together with the consideration mentioned by Judge Rich near the end of his opinion—adequately explains the delay in the utilization of the invention. Third, the quick acceptance of the invention, once it was disclosed in this country, should be explained on the same basis. If the pertinent teachings of the German and French patents had been widely circulated to the wire reinforcement art in this country immediately after those patents issued abroad, I judge that the invention at issue would have been made very much earlier and would have attained like success. These are the reasons, in my view, why the "secondary considerations" fail to overcome the very strong case of obviousness from the admissions and the teachings of the references considered in the prevailing opinion.