**AMERICAN STOCK EXCHANGE, LLC, Plaintiff,**

v.

**MOPEX, INC., Defendant.**

**No. 00 Civ. 5943(SAS).**

United States District Court, S.D. New York.

Feb. 4, 2003.

Stuart I. Friedman, Andrew A. Wittenstein, Paul S. Grossman, Friedman, Wittenstein & Hochman, A Professional Corporation, New York City, William K. West, Howrey Simon Arnold & White, Washington, DC, John J. Flood, National Association of Securities Dealers, Inc., Washington, DC, for Plaintiff.

Bradford P. Lyerla, Stephen R. Auten, Wallenstein & Wagner, Ltd., Chicago, IL, James R. Figliulo, Jeff D. Harris, James H. Bowhay, Michael K. Desmond, Figliulo & Silveran, P.C., Chicago, IL, Adam Landa, Greenburg Traurig, LLP, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Mopex, Inc. owns two business-method patents for a type of security called "Exchange Traded Funds" ("ETFs").[1] The AMEX filed this action on August 10, 2000, seeking a declaration that Mopex's patents are invalid and not infringed by the AMEX's activities with respect to certain of its own ETFs.

On September 14, 2000, Mopex filed an answer and asserted a counterclaim alleging that the AMEX is infringing one of Mopex's two patents[2] by permitting the trading of four series of funds on the floor of the AMEX.[3]

The AMEX now moves for summary judgment on the grounds that the '685 Patent is invalid under sections 102(b) and (g) of the Patent Act, 35 U.S.C. § 100 *et seq.* Mopex cross-moves for partial summary judgment in its favor. For the reasons set forth below, summary judgment is granted in favor of the AMEX and the '685 Patent is declared invalid.

## I. FACTS

### A. SEC Procedures Regarding Exemptive Applications

Before an ETF may trade on a securities exchange, its sponsor must file an application describing the product in detail and requesting exemption from certain provisions of the Investment Company Act of 1940 ("the Act"). *See* 17 C.F.R. § 270.22c–1(a); 15 U.S.C. § 80a–6(c). Hundreds of applications for exemptions under the 1940 Act are submitted to the Securities and Exchange Commission ("SEC") each year.[4] *See* Declaration of Michael W. Mundt, Senior Special Counsel in the SEC's Division of Investment Management ("Mundt Dec."), Ex. B to Mopex App., ¶ 4.[5] Typically, four to five copies of each application are filed. *See* Deposition of Larry Mills, SEC Records Officer ("Mills Dep."), Ex. G to Declaration of Paul S. Grossman, counsel for the AMEX ("Grossman Dec."), at 11. Once an exemptive application is filed and stamped by the SEC with the official filing date, one copy is placed in the SEC's Public Reference

---

1. An "ETF" is a publicly-traded security, structured as a unit investment trust, grantor trust, or mutual fund, that represents a portfolio of securities. *See* Deposition of Lawrence Larkin, employee of the American Stock Exchange (the "AMEX"), Ex. Y to Mopex's Appendix of Evidentiary Materials ("Mopex App."), at 17–18, 41, 137. The performance of an ETF corresponds generally to the price and yield of a particular index, such as a stock market or bond index. *See* Deposition of Gary L. Gastineau, expert witness for the AMEX ("Gastineau Dep."), Ex. L to Mopex App., at 15–17.

2. Mopex alleges only that the AMEX is infringing U.S. Patent No. 6,088,685 (the "685 Patent")—not U.S. Patent No. 5,806,048.

3. Mopex asserts that the AMEX is infringing independent claims 2, 13, and 24, as well as various dependent claims of the '685 Patent (collectively, "Asserted Claims"). Mopex is

precluded from asserting that the AMEX additionally infringed claim 34. *See American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, ——, 2002 WL 31812680, at *10 (S.D.N.Y. 2002).

The ETFs accused of infringement by Mopex are: the iShare funds (formerly, World Equity Benchmarks or "WEBs" funds), the Select Sector SPDR funds, the streetTRACKS funds, and the VIPERs funds (collectively, the "Accused Funds").

4. The SEC is the sole agency with the authority to grant exemptions from the 1940 Act. *See* 15 U.S.C. § 80a–6(c); Affidavit of Clifford J. Weber, Senior Vice President of the AMEX ("Weber Aff.") ¶ 6.

5. The number of exemptive applications filed under the 1940 Act in 1993, excluding those filed for insurance products, totaled 283 with another 295 in 1994, 372 in 1995, and 344 in 1996. *See id.*

Room ("Reference Room"), one copy is used to update the SEC's database, and the original is sent to Disclosure, Inc. for processing.[6] *See* Mills Dep. at 12.

Typically, applications are entered into the SEC database and thereby made available to the public within one to three days after they are filed.[7] *See id.* at 15. The applications are indexed in the database by the name of the company, filing dates, form type, file number, and control number. *See* Declaration of Larry Mills ("Mills Dec."), Ex. F to Mopex App., ¶ 6. The "form type" indicates that the document is an exemptive application under the 1940 Act. *See* Mills Dep. at 16–17. There is no subject matter index that would enable a person to search the database by a particular topic. *See id.* at 17, 27–29; Mills Dec. ¶ 8. Thus, unless a person knew the time frame or name of the company that filed the application, she would have to search all of the applications filed under the 1940 Act. *See* Mills Dec. ¶ 8.

Under the 1940 Act Rules, notice of any proceeding initiated by the filing of an exemptive application pursuant to the Act, must be published in the Federal Register. *See* 17 C.F.R. § 270.0–5(a).

### B.  The WEBs Exemptive Application

In early 1993, the AMEX introduced the first ETF to the marketplace as Standard and Poor's Depository Receipts ("SPDRs"). *See* Memorandum of Law in Support of the AMEX's Motion for Summary Judgment ("AMEX Mem.") at 4. SPDRs is an ETF that replicates the performance of the popular stock index, "S & P 500". *See id.* Thereafter, other finan-

cial companies began to develop ETFs, modeled after SPDRs, to replicate other stock indexes. *See id.* One of the first of these other ETFs to be developed was WEBs. *See id.*

On September 19, 1994, Morgan Stanley, through its affiliate, Foreign Fund, Inc., filed an exemptive application for WEBs with the SEC. *See* WEBs Application, Ex. A to Affidavit of Donald R. Crawshaw, counsel for Morgan Stanley ("Crawshaw Aff."). A copy of the WEBs Application was placed promptly in the Reference Room after it was filed. *See* Mills Dep. at 23.

As set forth in the WEBs Application, WEBs are designed to track foreign stock indexes compiled by a subsidiary of Morgan Stanley, Morgan Stanley Capital International ("MSCI"). *See* Mopex's Responses to the AMEX's First Requests for Admissions, Ex. O to Grossman Dec., ¶¶ 209, 213. Each index is a subgroup of a larger group of stocks, such as the MSCI All Country Indexes and the MSCI World Index. *See* Deposition of MSCI, Ex. I to Grossman Dec., at 18–19.

After the original WEBs application was filed in September 1994, the SEC staff made comments. *See* Foreign Fund, Inc., Notice of Application, 61 Fed.Reg. 5425 (Feb. 12, 1996) ("WEBs Notice"), Ex. C to Mopex App. The WEBs application was subsequently amended on three occasions—December 23, 1994; May 19, 1995; and January 17, 1996. *See id.* Notice of the WEBs Application was published in the Federal Register on February 12, 1996. *See* WEBs Notice.

---

6.  Disclosure is a private corporation under contract with the SEC to collect and archive documents filed with the SEC and to provide copies to the public, upon request. *See* Deposition of Mary Ann Wismer, employee of Disclosure, Ex. L to Grossman Dec., at 40.

7.  The computers in the Reference Room provide public access to the SEC's database, in which all public filings, including exemptive applications, are indexed. *See id.* at 15–16.

WEBs began trading on the AMEX in 1996 after they were approved by the SEC. *See* Deposition of Robert S. Tull, Jr., WEBs developer, Ex. J to Grossman Dec., at 16. In 2000, WEBs were renamed "iShares MSCI series" and Foreign Fund, Inc. became iShares, Inc. *See* Crawshaw Aff. ¶ 3.

### C. The '685 Patent

Mopex filed the original application for the '685 Patent in the United States Patent and Trademark Office ("PTO") on October 12, 1995, naming Kenneth Kiron and Kevin S. Bander, founders of Mopex, as the inventors. *See* '685 Patent, Ex. G to Declaration of Stuart F. Friedman, Esq., counsel for the AMEX ("Friedman Dec."). In mid-October 1999, Mopex's attorneys obtained a copy of the WEBs Application and realized that the application described an ETF product that Mopex intended to accuse of infringement of the '685 Patent. *See* Deposition of Edward Bishop, counsel for Mopex, Ex. C to Grossman Dec., at 174, 178.

## II. LEGAL STANDARDS

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Housing Auth. of City of New Haven*, 251 F.3d 307, 314 (2d Cir.2001) (internal quotation marks and citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the nonmovant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The non-moving party may not, however, "rest upon … mere allegations or denials." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted). Mere conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

Patent cases are not immune to summary judgment. The Federal Circuit has "repeatedly emphasized that summary judgment is as appropriate in a patent case as any other." *Avia Group Int'l, Inc. v. L.A. Gear California*, 853 F.2d 1557, 1561 (Fed.Cir.1988).[8]

### B. Patent Invalidity

■ A patent enjoys a presumption of validity. *See* 35 U.S.C. § 282. Nevertheless, a patent may be held invalid where an alleged infringer proves, by clear and convincing evidence, that a prior art reference anticipates the invention. *See* 35 U.S.C. § 102; *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir.1999); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir.1986). Where the alleged infringer produces prior art or evidence not considered by the PTO, her burden is significantly reduced.[9] *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359–60 (Fed.Cir.1984) ("What the production of new prior art or other invalidating evidence not before the PTO does is to eliminate, or at least reduce, the element of deference due to the PTO, thereby partially, if not wholly, discharging the attacker's burden. . . ."); *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 905 (Fed.Cir.1985) (finding appellants' burden of proof under section 282 to be "more easily carried" because the court did not have the benefit of the PTO's view on the validity of the references).

### III. DISCUSSION

The AMEX argues that the '685 Patent is invalid because the WEBs Application constitutes prior anticipating art under 35 U.S.C. § 102. A patent is "anticipated" by a prior publication and therefore invalid if the invention was "described in a printed publication . . . more than one year prior to the date of the [patent] application."[10] 35 U.S.C. § 102(b). The bar is based on the principle that "once an invention is in the public domain, it is no longer patentable by anyone." *In re Hall*, 781 F.2d 897, 898 (Fed.Cir.1986) (citation omitted). Before considering whether the WEBs Application anticipated the '685 Patent, a threshold question is whether the WEBs application was described in a "printed publication" prior to the critical date—October 12, 1994.

### A. Printed Publication

■ A reference is a "printed publication" within the meaning of section 102(b) if it was "available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, [could] locate it." *In re Wyer*, 655 F.2d 221, 226 (Cust. & Pat.App. 1981). *See also Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1568 (Fed.Cir.1988). "Accessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to. If accessibility is proved, there is no requirement to show

---

**8.** The material facts in this case are largely undisputed. Although the parties deny many of the statements contained in the opposing party's Rule 56.1 Statement of Material Facts, these factual disputes are not "material" and therefore do not preclude resolution of the summary judgment motions.

**9.** The PTO never considered the WEBs Application as prior art. *See* '685 Patent Prosecu-

tion History, Ex. I to Friedman Dec., at 000114, 000125 (indicating that the patent examiner did not consider the six documents listed in Mopex's Information Disclosure Statement, the first of which was the WEBs Application).

**10.** The critical date here is October 12, 1994.

that particular members of the public actually received the information." *Id.*

▮ Whether a reference is a "printed publication" is a "legal determination based on underlying issues of fact" and, therefore, "must be approached on a case-by-case basis." *In re Hall*, 781 F.2d at 898. Because the underlying material factual issues are undisputed here, this issue is ripe for summary judgment.

The WEBs Application became "publicly accessible" on or around September 22, 1994, when it was filed in the SEC's Public Reference Room because a person skilled in the art would have been able to locate it with relative ease. A person skilled in the art is defined here as someone who is accustomed to dealing with ETFs. That person undoubtedly knows that before an ETF can trade, an application for exemption under the 1940 Act must be filed with the SEC, and that all such applications are made publicly available in the Reference Room.[11] Thus, if a person wanted to know whether any ETFs constitute prior art, she would only need to look in one place.

Within the Reference Room, the WEBs Application could have been located with a modicum of effort. Larry Mills testified that a member of the public could have easily found the WEBs Application by "ask[ing] for and receiv[ing] all Applications filed within a particular time frame." *See* Mills Dec. ¶ 8; Mills Dep. at 37–38. If that person did not have the name of the company or the time frame that the application was filed, she still could have found the application by looking through all of the applications filed under the 1940 Act,

which is approximately 300 per year.[12] *See* Mundt Dec. ¶ 4; *see also* Deposition of Kathryn McGrath, former director of SEC's Division of Investment Management, Ex. M to Grossman Dec., at 44 ("You can find exemptive applications . . . by reference to the statutes and the statutory sections and rules that they're asking for exemptions from, and the names of the applicant, and then by skimming through the texts of those applicat[ions]. . . . There isn't such a dramatic volume of them[;] its not that difficult to find them."). The need to flip through hundreds of documents, although time-consuming, clearly falls within the bounds of "reasonable diligence". Surely, if a single copy of a doctoral dissertation maintained in one university library in Germany has been found to be "publicly accessible", *see In re Hall*, 781 F.2d at 899–900, so too is an application that is indexed in the Reference Room—the most logical place to look for prior art.

Mopex argues that the WEBs Application was not sufficiently accessible to the public prior to the critical date because the SEC's database lacked a subject matter index. *See* Mopex's Memorandum of Law in Support of its Motion for Partial Summary Judgment and in Opposition to AMEX's Motion for Summary Judgment ("Mopex Mem.") at 8–11. This argument fails for several reasons. *First*, the SEC's database was searchable by subject matter because the "form type" enabled a person to identify exemptive applications filed under the 1940 Act. Thus, the "form type" served as a *de facto* subject matter index.[13]

---

11. Pursuant to 15 U.S.C. § 80a–44, information filed with the SEC "shall be made available to the public" unless there is a particular reason for not doing so.

12. Because exchange traded funds were not invented until 1993, there would be no need to go back more than a couple of years.

13. It is not clear whether it was possible to search by "form type" on the computer terminals in the Reference Room in 1994. *See* Mills Dep. at 18 (stating he was "not sure" whether the SEC database could be searched by form type). If it were not possible, then a person would have had to flip through thou-

*Second,* the lack of a subject matter index is not dispositive. *See Mobil Oil Corp v. Amoco Chems. Corp.,* 779 F.Supp. 1429, 1489 (D.Del.1991) (suggesting that subject matter indexing is not required so long as alternative research methods are available), *aff'd,* 980 F.2d 742 (Fed.Cir. 1992); *E.I. DuPont de Nemours & Co. v. Cetus Corp.,* 1990 WL 305551, 19 U.S.P.Q.2d (BNA) 1174, 1185 (N.D.Cal. 1990) (finding grant proposal listed in an index that included the title, author, institution, and grant number—but not the subject matter—to be publicly accessible).

*Third,* there was no need for a subject matter index because all of the relevant art already was segregated in one room. It is true that when a publication is kept in a public library or database, courts have tended to focus on whether the document was catalogued, indexed, or shelved. That is, where there is some type of systematic index or catalogue of the materials in question, courts have consistently held that the reference is publicly accessible. *Compare In re Hall,* 781 F.2d at 899–900 (finding dissertation sufficiently accessible because it had been indexed, catalogued, and shelved) and *In re Wyer,* 655 F.2d at 226–27 (finding a microfilmed Australian patent application on file and open to public inspection at the Australian Patent Office and five sub-offices sufficiently accessible) *with In re Cronyn,* 890 F.2d 1158 (Fed. Cir.1989) (finding three undergraduate theses, referenced only by index cards filed alphabetically by author and held in a

shoebox in the chemistry department, inaccessible to the public) and *Application of Bayer,* 568 F.2d 1357, (Cust. & Pat.App. 1978) (holding that an un-catalogued, un-shelved thesis available only to a graduate committee is not a "publication" under section 102(b)). However, the existence or nature of an indexing system is only one factor to be considered in assessing the public availability of a work.[14] *See In re Wyer,* 655 F.2d at 226; *see also Cronyn,* 890 F.2d at 1161 (Mayer, J. Dissenting) ("[An indexing system] is neither a necessary nor a sufficient condition for publication."). The critical question is whether a person skilled in the art would have been able to find the document.

In all of the cases cited by Mopex and described above, the courts focused on the nature of the library's indexing system because there was no other way to limit the search for the documents. Here, the universe of places a person skilled in the art would look to find the WEBs Application was limited by virtue of the fact that all exemptive applications under the 1940 Act are filed in the Reference Room. The existence of a library dedicated to the subject matter at issue renders the nature of that library's indexing system largely irrelevant. For even if there were no index, which is not the case, the WEBs application could have been found with reasonable diligence and therefore constitutes a "printed publication" within the meaning of section 102(b).

---

sands, rather than hundreds, of applications, which still falls within the bounds of "reasonable diligence".

**14.** Another factor considered by courts is whether the reference was intended to be made available to the public. *See, e.g., In re Wyer,* 655 F.2d at 222 (stating that "intent to make public" is one factor, among many, in "determining whether an item may be termed a 'printed publication'"); *Bristol–Myers*

*Squibb Co. v. Boehringer Ingelheim Corp.,* 86 F.Supp.2d 433, 444 (D.N.J.2000), *aff'd in part, vacated in part on other grounds,* 246 F.3d 1368 (Fed.Cir.2001) (stating "the intent behind distribution is key"). There is no question that the purpose of the SEC's Public Reference Room was to make documents filed with the SEC available to the public, as required by 15 U.S.C. § 80a–44. *See* Mills Dep. at 36–37.

## B. Anticipation

To determine whether a patent has been anticipated, a court must engage in a two-step analysis. *First,* the court must construe the patent's claims. *See Key Pharms. v. Hercon Labs. Corp.,* 161 F.3d 709, 714 (Fed.Cir.1998). *Second,* the court must compare the construed claim to the prior art. *See id.* If a genuine issue of material fact arises at any one of these steps, summary judgment must be denied.

### 1. Claim Construction

▮ The parties agree on all matters of claim construction except one—the meaning of the term "sector", which appears in independent claim 13 and the dependent claims that incorporate claim 13 (claims 14 through 23). Claim 13 requires that securities be separated into a "sector" that "compris[es] a subset of the group of securities" and "satisf[ies] a specific criteria." *See* '685 Patent at column 9, lines 14–16. Mopex contends that the use of the term "sector" refers to subsections of the economy based on a particular industry (*e.g.,* the "chemical sector" or "financial sector"). *See* Mopex Mem. at 18–19. The AMEX argues, on the other hand, that while the term "sector" is sometimes used to refer to specific industries, its use in the '685 [P]atent is much broader and encompasses any subdivision. *See* AMEX Mem. at 27.

▮ Claim construction is an issue of law, *see Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir. 1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and is therefore a proper subject for summary judgment. In construing patent claims, courts should look first to the intrinsic evidence of the record—"the patent itself, . . ., the specification, and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). Within the intrinsic evidence, there is a "hierarchy of analytical tools." *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344 (Fed.Cir.1998).

▮ *First,* courts look to the words of the claim itself. *See id.* ("The actual words of the claim are the controlling focus."). Unless a "special definition of the term is clearly stated in the patent specification or file history," words in a claim are given their ordinary and customary meaning. *Display Techs., Inc. v. Paul Flum Ideas, Inc.,* 75 F.Supp.2d 283, 290 (S.D.N.Y.1999) (citing *Vitronics,* 90 F.3d at 1582). "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996). Judges are free to consult technical treatises and dictionaries at any time to help determine the meaning of claim terms. *See Vitronics,* 90 F.3d at 1584 n. 6.

*Second,* "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics,* 90 F.3d at 1582. The specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id. Third,* the record of all the proceedings before the PTO may be helpful. *See Display Techs.,* 75 F.Supp.2d at 290.

▮ If the intrinsic evidence does not resolve all ambiguities, courts may then look to extrinsic evidence, such as expert testimony, depositions, declarations, and admissions. *See Kegel Co. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1426 (Fed.Cir.

1997); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed.Cir.1991).

The intrinsic evidence in this case makes clear that the term "sector" is used in the '685 Patent to mean a subdivision or subsection, which may or may not relate to a particular industry. Because the patent specification does not give the term "sector" any special meaning, it must be given its ordinary meaning, which is, in this context, the meaning that persons experienced in ETFs would give the term. The best place to look for that meaning are financial or investment dictionaries.[15] *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed.Cir.2002) (acknowledging that dictionaries "may be the most meaningful sources of information to aid judges in better understanding ... the terminology used by those skilled in the art to describe the technology."). Although financial dictionaries provide varied definitions of the word "sector", they all agree that the core meaning of the term is the idea of a subdivision, which may (but not must) relate to a particular industry. *See, e.g.,* investorwords.com, *at* http://www.investorwords.com/cgi-bin/getword.cgi?4430 & sector (defining sector as "a distinct subset of a market, society, industry, or economy, whose components share similar characteristics"); Money Words Empowerment Venue, *at* http://www.moneywords.com/glossary/detail.CFM?ID=3726 & SearchTerm=Sector (defining sector as a "distinct part of a market, society, industry, or nation's economy"); Campbell R. Harvey's Hypertextual Finance Glossary, *at* http://www.duke.edu/~arvey/Classes/wpg/bfgloss.html (defining sector as "a group of securities that are similar with respect to maturity, type, rating, industry, and/or coupon"); Yahoo! Financial Glossary, *at* http://biz.yahoo.com/f/g/bfgloss.html (same); Bloomberg Financial Glossary, *at* http://www.bloomberg.com/money/tools/bfgloss.html (same).[16]

Moreover, the patent specification uses the term "sector" interchangeably with "subgroup", thereby suggesting that the two words are synonymous. *See* Patent '685 at column 7, lines 36–46 ("[T]he index of mutual funds described herein provides a means for identifying superior historical performance within each *subgroup* .... The hope is that by identifying and investing within an index of funds that have demonstrated superior risk/return ratios within a particular *sector*, these funds will continue to produce superior returns with low risk.") (emphasis added).

**2. Comparison of Patent Claims to Prior Art**

The next question is whether the WEBs Application anticipates all of the Asserted Claims. "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Constant,* 848 F.2d at 1570. If any claim element is absent, then the reference does not anticipate that claim. *See Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1571 (Fed.Cir.1986).

---

**15.** Mopex relies primarily on the deposition testimony of experts and witnesses for its definition of "sector". *See* Mopex Mem. at 18 (citing the definitions provided by Weber, Gastineau, and Nathan Most, a former senior vice president of the AMEX). Such reliance on extrinsic evidence is unnecessary and improper here.

**16.** A court must consider an array of dictionaries in determining the "plain meaning" of a term. *See* Geoffrey Nunberg, *High Definition,* The American Lawyer, Jan. 17, 2003, *available at* http://www.nylawyer.com/cgi-bin/getdoc.pl?*id*=news/03/01/011703C.html.

The AMEX argues that the WEBs Application disclosed "a method for creating and administering a financial product identical in every relevant way to the method claimed in the '685 Patent'," thereby anticipating each of the claims in the '685 Patent. *See* AMEX Mem. at 23. Mopex claims that the WEBs application does not disclose the sector element of claim 13 and its dependent claims and therefore does not anticipate those claims. *See* Mopex Mem. at 18.

Mopex admits, however, that the WEBs Application disclosed the idea of "separating [a] group of securities into at least one *subset* of securities satisfying a predetermined criteria," although it does not use those specific words. *See* Deposition of Kenneth Kiron, Ex. F to Grossman Dec., at 682, 684 (emphasis added).[17] Because I have construed the term "sector" to mean "subsection" or "subdivision", the absence of the particular word "sector" in the WEBs Application is immaterial. Mopex admits that all the other elements of the remaining claims are disclosed. *See* AMEX Mem. at 23–27, 29–30 (citing Mopex's admissions with respect to each element of the other claims). I therefore find that the WEBs Application discloses all of the elements of the Asserted Claims.

Because the AMEX has demonstrated that the WEBs application was "publicly accessible" more than one year prior to the patent application, and the WEBs Application discloses all of the elements of the Asserted Claims, the '685 Patent was anticipated by prior art and is therefore invalid. This finding of patent invalidity under section 102(b) is dispositive of all issues with respect to the '685 Patent.

## IV. CONCLUSION

Because there are no genuine issues of material fact, the AMEX's motion for summary judgment as to the validity of the '685 Patent is granted. A conference is scheduled for February 11, 2003 at 3:30 p.m.

SO ORDERED.

**17.** The WEBs Application discloses, in particular, that securities are separated based upon "foreign country indexes". *See* WEBs Application at 2–3, 25. Each of these indexes is a "sector" of the MSCI World Index. In fact, Mopex itself has referred on more than one occasion to the Japanese stock market as a "sector". *See* 11/13/92 Presentation on Mutual Fund Options, Ex. C to Weber Aff., at 0000112 ("In addition there are a countless number of funds that speculate on such diverse *sectors* as the Japanese Stock Market ....") (emphasis added); 3/17/95 Presentation to the Chicago Board Options Exchange, Ex. M to Friedman Dec., at 005505 (same).